IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 3, 2004

## STATE OF TENNESSEE v. KAHNIL WALLACE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-06492     Chris Craft, Judge**

_____

**No. W2003-02869-CCA-R3-CD  - Filed March 8, 2005**

_____

The appellant, Kahnil Wallace, was convicted by a jury in the Shelby County Criminal Court of felony murder, aggravated robbery, and criminal attempt to commit theft of property. The appellant was sentenced to life imprisonment for the felony murder, twelve years incarceration for the aggravated robbery, and six months for the attempt to commit theft of property. On appeal, the appellant challenges the sufficiency of the evidence and the trial court's ruling allowing the State to introduce evidence of his prior conviction of armed robbery for impeachment purposes. Upon review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and THOMAS T. WOODALL, J., joined.

Robert Wilson Jones, Shelby County Public Defender; W. Mark Ward, Assistant Public Defender (on appeal); and William L. Johnson, Assistant Public Defender (at trial), for the appellant, Kahnil Wallace.

Paul G. Summers, Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Thomas Henderson and Jennifer Nichols, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

In January 2002, the twenty-year-old victim was living with Jerry Dale Tigner, Jr., her boyfriend of four years. The couple rented a house owned by the victim's father, which house was located on O.K. Robertson Road in Shelby County, Tennessee. They shared the house with Adam Whitehead and his brother Brian. In the living room, Tigner had "[a] digital studio for making music and mixing music." The studio contained recording equipment valued at approximately $7,000.

Bobby Hill, who had previously lived on O.K. Robertson Road, knew the victim and Tigner. He also knew Cleophus Craft, who lived in a duplex approximately one-half mile from Hill's home. At trial, Hill testified that prior to the instant offenses, Craft approached Hill and asked for directions to Tigner's house. According to Hill, Tigner was "a rapper and did music," and Craft wanted to record a compact disc (CD). Hill provided Craft with directions to Tigner's house.

In January 2002, Lavelle Taylor lived next door to Craft. Taylor testified that on January 3, 2002, he was standing on his front porch and observed the appellant arrive at Craft's residence driving a gray Buick Roadmaster. Taylor related that Craft removed a rifle from the trunk of the vehicle, and Craft and the appellant went inside the house. Craft subsequently returned the rifle to the trunk and got into the passenger's side of the vehicle. Thereafter, the appellant walked out of the house and got into the driver's side. After the men drove away, Taylor telephoned the police and informed them of his observations. On March 21, 2002, Taylor again saw the appellant and telephoned police.

Tigner testified that at noon on January 3, 2002, he was awakened by a telephone call. After the call, Tigner got out of bed and walked to the kitchen. Through the kitchen window, Tigner observed two men sitting on the hood of a gray Buick Roadmaster in his driveway. Because he did not know the men, he decided to go outside and see what they wanted. Tigner grabbed a .357 revolver, placed it in a kitchen cabinet near the back door, and walked outside.

As Tigner approached, one of the men introduced himself as "Cleo [Craft]" and said that he wanted to "talk . . . about doing some music." While Tigner and Craft discussed "mix[ing] a CD," the other man, later identified as the appellant, leaned against the vehicle. Shortly thereafter, Tigner went inside the house to write down his telephone number for Craft. When he returned, Craft continued to question him about recording a CD. During the conversation, Tigner heard a clicking sound and turned to see the appellant pointing a shotgun in his face. Craft grabbed Tigner around the neck and placed a pistol to his head. Craft told Tigner "to drop off all [his] stuff," indicating that Tigner was "to give him whatever [he had]."

Craft and the appellant then forced Tigner into the house. After entering the kitchen, Tigner attempted to disarm Craft, but Craft struck him in the head with the pistol and threatened to kill him. Thereafter, Craft entered Whitehead's bedroom and forced Whitehead and his girlfriend, Colleen Dickinson, to lie face down on the floor. While Craft was in Whitehead's bedroom, the appellant pointed his shotgun at Tigner and the victim and ordered them to their bedroom. The appellant demanded "dope," money, and guns. Tigner gave the appellant some money from the pocket of a pair of jeans and told the appellant that a broken rifle was located behind the bedroom door. The appellant grabbed the rifle and began ransacking the room.

As the appellant ransacked the room, Tigner and the victim knelt on the hall floor. Tigner told the victim to retrieve the gun he had placed in the kitchen cabinet, but the victim was unable to locate the gun. Tigner then attempted to obtain the weapon; however, as he entered the kitchen, Craft walked around the corner and struck him on the head with a pistol, threatening to kill him.

-2-

When Craft walked into Whitehead's bedroom, Tigner removed the gun from the cabinet and went to the bedroom. Whitehead was lying on the bedroom floor, and Craft was standing in front of the studio equipment. Craft turned suddenly, and Tigner fired one shot into the room. Without looking, Tigner fired again and then ran toward his bedroom to confront the appellant.

Before Tigner reached his bedroom, Craft ran out of Whitehead's bedroom and pushed Tigner into a glass door, shattering the glass and breaking a "big tupperware thing full of dog food." As Tigner and Craft struggled over Tigner's gun, the victim ran out of the house. During the struggle, Craft bit off the top of Tigner's ear, and Tigner shouted to Whitehead for assistance. Responding to Tigner's call, Whitehead ran into the room and attempted to shoot Craft, but his gun jammed. Whitehead then struck Craft in the head twice with the gun.

Thereafter, Tigner discovered the victim lying face down on the carport floor. The appellant was attempting to get into his vehicle and upon seeing Tigner fired four shots. According to Tigner, the first two shots struck the top of the house. The third shot struck the wall near Tigner. The fourth shot struck the car door and a front tire. Tigner ran inside the house to obtain bullets, but when he returned the appellant was backing his car out of the driveway. As the appellant drove away, Tigner discovered that the victim was dead. Shortly thereafter, the police arrived at the scene. Tigner told the officers what had occurred, advising them that money, a pendant from a necklace, a diamond ring, and a Tec-9 pistol had been taken.

Tigner testified that two days after the incident, he was asked to view a photographic lineup, but the appellant's photograph was not included in the lineup. Thereafter, on March 21, 2002, a Shelby County Sheriff's deputy telephoned Tigner and asked him to come to the Investigation Bureau to view a photographic lineup. Tigner identified the appellant as the man who accompanied Craft to his house.

Adam Whitehead testified that on the morning of January 3, 2002, Craft entered his bedroom and forced him and his girlfriend, Colleen Dickinson, to the floor. Threatening to shoot Dickinson, Craft demanded to be told where the studio equipment was located. Whitehead pointed to the equipment in the adjoining room. As Craft walked over to the equipment, Whitehead heard gunshots. Craft ran out of the room. Shortly thereafter, Tigner shouted for Whitehead to shoot Craft. Whitehead grabbed his pistol, ran into the kitchen, and attempted to shoot Craft, but his gun jammed. Whitehead then struck Craft twice on the head with the butt of the gun. When Craft attempted to stand, Whitehead threw down his gun, "jumped on [Craft] and choked him [until he stopped moving]." As Whitehead used Dickinson's cellular telephone to call 911, Tigner informed Whitehead and Dickinson that the victim was dead. Whitehead testified that he had never seen Craft or the appellant before the instant offenses.

Colleen Dickinson testified that Craft entered Whitehead's bedroom, forced her and Whitehead to the floor, and demanded to know the location of the studio equipment. Suddenly, they heard gunshots, and Whitehead shoved Dickinson under the bed. While under the bed, Dickinson heard what sounded like "bumping against the walls," then silence. After several minutes of silence,

Dickinson got out from beneath the bed and walked to the kitchen where she observed Craft lying "dead on the kitchen floor." Dickinson then went outside to the carport and observed the victim on the ground. When the police arrived, Dickinson informed the officers that she recalled seeing a gray, older model car in the driveway when she looked out the window prior to Craft and the appellant entering the house. Dickinson testified that she had never seen either of the men before that day.

Trooper Steve Max of the Tennessee Highway Patrol testified that on January 3, 2002, he was patrolling north Shelby County when a deputy with the Shelby County Sheriff's Department drove by with his emergency equipment activated. The deputy motioned for Trooper Max to follow him. They proceeded to 5263 O.K. Robertson Road where Trooper Max observed a young man sitting in the garage holding a towel to his ear. The towel was covered in blood. A white female was lying face down near a vehicle parked in the garage, surrounded by a large amount of blood.

Shawne Williams testified that in January 2002, a man named Robert arrived at his house driving the appellant's gray Buick Roadmaster. Williams knew the appellant, whom he referred to as "Red," from the local community center. Robert told Williams that the appellant wanted him to take the vehicle. Williams then spoke with the appellant on a cellular telephone. The appellant asked Williams to take the vehicle, but Williams refused. Before ending the call, the appellant told Williams to watch the news. Although Williams refused to allow Robert to leave the vehicle at his house, he gave Robert a can of gasoline and told him to drive the vehicle "over the tracks." After Robert drove away, Williams looked over his fence and observed the car in flames.

Detective Scott Wright testified that on January 3, 2002, he was called to investigate the scene of a homicide at 5263 O.K. Robertson Road. As Detective Wright photographed the scene, he observed four shotgun shells and three shotgun "waddings" laying on the driveway. On the hood of a vehicle in the carport, he observed a mark that appeared to have been caused by a bullet that "hit, skipped up and hit right up there in the top [of the carport]." Detective Wright observed the victim's body lying near the tire of a car parked in the carport. Marks on the tire's hubcap appeared to have been caused by a shotgun blast. Detective Wright also observed shotgun patterns on the walls in the carport. He subsequently discovered a bedroom window that appeared to have been broken from the inside, and the glass in the front door was shattered.

In March 2002, Detective Wright spoke with Lavelle Taylor who indicated that he could identify the individual he had seen with Craft on January 3, 2002. Detective Wright showed Taylor a series of photographs on the computer, randomly pulling up screens of six individuals. Taylor identified the appellant as the individual he had seen on the day of the homicide. Detective Wright then telephoned Tigner and asked him to view a photographic lineup. Tigner identified the appellant as the individual who had accompanied Craft to his residence.

On March 22, 2002, a resident in Northaven reported the discovery of a shotgun underneath a shed behind her house. Detective Wright asked Officer Steven Culley to retrieve the gun, which was believed to have been used in the instant offenses. Officer Culley recovered the weapon, a Remington 20 gauge shotgun, and delivered it to Detective Wright.

-4-

Sergeants Ray Sides and James Mayes were involved in the investigation of the instant offenses. They collected spent .357 shell casings from the den floor, a live .380 round that had misfired, a .357 revolver from the kitchen counter, a black clip for a Tec-9 pistol, and a black Marksman BB gun discovered on the floor beside Craft's body. By the "east door," Sergeant Sides discovered what appeared to be "human skin, a piece of an ear possibly." Outside, they collected shotgun "waddings" from the carport and glass from a broken window. Sergeant Sides testified that although the pieces of glass had blood on them, the amount was insufficient for testing by the Tennessee Bureau of Investigation (TBI). Sergeant Sides also observed a gunshot in the living room wall. According to Sergeant Sides, the shooter "had to have been standing . . . at the doorway of the kitchen into this bedroom slash dining room . . . when he shot into this wall and then one into this foyer." Sergeant Mayes testified that on January 9, 2002, he asked Tigner to view numerous photographs in an attempt to identify the individual who had accompanied Craft to his house on the day of the offenses. However, the group of photographs did not include a photograph of the appellant, and Tigner was unable to make an identification.

Tracy Brunt, the appellant's sister, testified that in the spring of 2002, the appellant informed her that a gun was hidden under the shed in her backyard. Brunt immediately telephoned the Sheriff's Department and asked them to remove the weapon. Officer Steven Culley retrieved the shotgun from underneath the shed and delivered it to Detective Wright. Officer Culley estimated that the weapon had been underneath the shed only a few weeks.

TBI Special Agent Heath Barker, a forensic scientist specialized in firearms identification, testified that in the instant case he received several items for identification and comparison. He received a shotgun which he identified as a "Remington model 1100 LW . . . semiautomatic shotgun." He also received four expended Remington "shot-shell cases." Agent Barker compared these "shot-shells" to test shells fired from the shotgun. He "match[ed] all four of these shot-shell cases back to this shotgun." Agent Barker also received three shotgun "waddings" recovered at the scene, which "waddings" were consistent with the test shell "wadding." Agent Barker testified that two weeks prior to trial, the State asked him to look at "a live .380 round" discovered at the scene. He testified that the bullet appeared to have been "pushed back into the cartridge case," stating that it was likely the gun "jamm[ed]." Agent Barker further testified that a shotgun fired a shell containing numerous pellets, and a .357 or .38 revolver fired a single projectile.

Dr. Teresa Campbell, a forensic pathologist at the Regional Medical Forensic Center in Memphis, testified regarding the autopsies of the victim and Craft.[1] After reviewing Craft's autopsy report, Dr. Campbell testified that

> [a] bullet entered into the left chest cavity beneath the third rib. It perforated the left upper lobe of the lung, the left upper main stem bronchus, and the pulmonary artery. And then perforated the apical,

---

[1] The autopsies were performed by Dr. O.C. Smith, the Shelby County Medical Examiner, who was unavailable to testify at trial.

-5-

or the top of the left lower lobe of the lung. And then it exited the
chest cavity beneath the left eighth rib and exited . . . the left back.

According to the report, "[t]he cause of [Craft's] death was a gunshot wound to the chest, and the manner of death was a homicide."

Dr. Campbell also reviewed the victim's autopsy report. According to the report, the victim suffered a laceration to the right forehead, "[t]he soft tissue was split open and the bone was visible." The victim also suffered a gunshot wound to the neck. Dr. Campbell testified that the bullet entered the "right back of the neck," went through the victim's necklace, "traversed the skin and subcutaneous tissues fracturing the right aspect of [the cervical spine]," transected the right vertebral artery, and exited the front of the victim's neck. Dr. Campbell explained that the injury to the cervical spine would have caused the victim to immediately collapse and cease breathing. She estimated that the victim died within five minutes from lack of oxygen to the brain. Dr. Campbell further related that the head injury may have caused the victim to lose consciousness; however, the gunshot wound was the only fatal injury. A toxicology report revealed that at the time of death, the victim had no alcohol or illegal drugs in her system. On cross-examination, Dr. Campbell acknowledged that both the victim's and Craft's gunshot wounds were caused by a single projectile, not shotgun pellets.

Sergeant Richard Almond testified that on March 23, 2002, he went to the Williams Travel Center on Shelby Drive to pick up a "Tec 9" from Rosa Wallace. Two days prior to meeting Wallace, Sergeant Almond had escorted the appellant to the Shelby County Jail. At the jail, Sergeant Almond was required to obtain a print of the appellant's thumb on an arrest ticket. When the appellant saw the arrest ticket, he said, "I know what that is. That's a record of arrests. . . . They're fixing to charge me with murder and that's hard but fair." Sergeant Almond reported the appellant's comments to Sergeant Wright.

At trial, the appellant testified that he first met Craft at the "Penny Patrick." Craft was selling CDs and offered to exchange a CD for marijuana. On January 3, 2002, the appellant went to Craft's house to obtain the name of a man from whom the appellant could purchase marijuana "for a lesser price." Before going to the man's house, the appellant questioned Craft about the man, stating that he "kn[e]w about people setting people up to get robbed and get killed and things of that nature." Craft replied, "It'll be straight, man. I got a gun." Craft got a shotgun and told the appellant to get the bullets that were next to his chair. Craft loaded the shotgun, then placed it in the trunk of the appellant's vehicle. Thereafter, they drove to Tigner's house.

The appellant and Craft arrived at Tigner's house at approximately 10:15 a.m. As the appellant parked in the driveway, Craft said, "I'm fixing to go up to the house and get him." Craft exited the vehicle, walked to the front door, and knocked. No one came to the door. Craft returned to the vehicle and asked to borrow the appellant's cellular telephone. Craft dialed Tigner's telephone number, but no one answered. Craft was about to return to the front door when a gray car driven by a woman wearing an oxygen mask pulled into the driveway. The woman asked the appellant and

Craft if they were looking for Tigner, and Craft replied that they were. The woman telephoned Tigner's house on her cellular telephone, then stated that "he'[d] be right out." Craft exited the vehicle and stood at the front of the vehicle.

Shortly thereafter, the victim walked out of the house and got into the woman's vehicle. The woman handed the victim money, and the victim gave the woman "some pills and something that looked like . . . a bag with marijuana . . . in it." Tigner then came outside and spoke with Craft. The appellant told Tigner that he wanted to purchase five pounds of marijuana. The appellant agreed to pay Tigner $2,500 for the marijuana and exited the vehicle.

As they walked towards the house, Tigner and Craft began arguing about a CD Craft had recorded. When the appellant told Tigner that he was not involved with the CD and just wanted the marijuana, Craft told Tigner, "[G]o on and take care of my little partner." The appellant testified that Tigner went into the house, then returned, walking "in a hip fashion . . . with a little thug walk." Tigner again told Craft to pay for "[his] beats," and Craft responded, "I ain't paying you nothing." Tigner then pointed a .357 revolver at Craft and forced Craft and the appellant into the house.

Once inside, Tigner again ordered Craft to pay him, but Craft stated that he had no money. Tigner ordered Craft and the appellant to get on the floor. He then "pat[ted]" their clothing, taking money from the appellant's right, front pocket. The appellant testified that Craft "jumped" Tigner. The appellant remained on the floor as they struggled, then he heard "a lick, like pow." The appellant testified that Tigner had shot Craft. As Craft fell to the ground, the appellant ran to the door to the carport. When he looked behind him, he observed Tigner standing with his weapon pointed at him. Tigner fired, and the appellant jumped out of the way. Thereafter, Whitehead came out of his bedroom. The appellant grabbed Whitehead, "used him to get around [Tigner]," and then ran through the house. Tigner fired another shot. As the appellant ran down the hall, he passed the victim running in the other direction.

The appellant ran into a bedroom and kicked the door closed. He heard Tigner and Whitehead saying, "[M]an, we got to go back there and kill that n***er." The appellant picked up a shotgun from behind the bedroom door, but observed that the gun was unloaded. He dropped the shotgun and picked up a Tec-9; however, the weapon was also unloaded. The appellant ran to the bedroom window and kicked it twice, breaking the glass. After using the Tec-9 to break the glass around the edges of the window, the appellant jumped out the window and ran to the front of the house.

When the appellant ran past the front door, he observed Tigner holding two revolvers. According to the appellant, Tigner fired at him five or six times. The appellant ran to his vehicle and attempted to place the key in the ignition. He then looked over the dashboard and observed Tigner approaching his vehicle. The appellant remembered the shotgun in the trunk and pressed the button to release the trunk latch. He then ran to the rear of his vehicle and grabbed the shotgun. Aiming "high," the appellant fired twice in an attempt "to make [Tigner] . . . back up off me." Tigner hid behind a car in the carport. Believing that Tigner was going to continue shooting at him, the

appellant fired at Tigner several times. He then got into his car and drove away. The appellant claimed that no one else was in the carport when he and Tigner exchanged gunfire.

After being advised that the police were looking for him and his vehicle, the appellant parked the car in front of his aunt's house. A friend subsequently drove the appellant to Mississippi. Thereafter, the appellant's aunt told him to move the car. Robert Hill drove the vehicle to Shawne Williams and told him to take the car. Williams refused. At trial, the appellant denied telling Hill to burn the car. The appellant further denied that he and Craft carried weapons into the home of the victim and Tigner. He testified that he aided police in their investigation, advising them of the location of the shotgun, the Tec-9, and his burned vehicle. On cross-examination, the appellant claimed that prior to trial, he had never seen Lavelle Taylor.

Based upon the foregoing evidence, the jury convicted the appellant of one count of felony murder, two counts of aggravated robbery, and two counts of criminal attempt to commit theft of property. The two counts of aggravated robbery were merged into one conviction, as well as the two counts of criminal attempt to commit theft of property. The trial court sentenced the appellant to life imprisonment for the felony murder, twelve years for the aggravated robbery, and six months for the criminal attempt. The trial court ordered the sentence for aggravated robbery to be served consecutively to the life sentence, for a total effective sentence of life plus twelve years. On appeal, the appellant challenges the sufficiency of the evidence and the trial court's ruling allowing the State to introduce evidence of his prior conviction of armed bank robbery for impeachment purposes.

## II. Analysis

### A. Sufficiency of the Evidence

On appeal, the appellant contends that the evidence was insufficient to support his convictions. Specifically, the appellant argues that his convictions were based primarily upon the testimony of Tigner, Whitehead, and Dickinson, who testified that the appellant and Craft entered their residence with the intent to commit aggravated robbery. The appellant claims that as evidenced by his testimony, he and Craft were the victims of the robbery.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the jury as trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a

convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree felony murder is defined in pertinent part as the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery . . . ." Tenn. Code Ann. § 39-13-202(a)(2) (2003). We note that "[a]lthough intent to kill is not required under the felony murder statute, the perpetrator must possess the requisite intent to commit the underlying felony for a felony murder conviction to be sustained." State v. John Dennis Rushing, No. 01C01-9501-CR-00020, 1996 WL 63920, at *6 (Tenn. Crim. App. at Nashville, Feb. 13, 1996); see also Tenn. Code Ann. § 39-13-202(b). As noted, aggravated robbery is the felony underlying the appellant's felony murder conviction. Aggravated robbery is defined as "the intentional or knowing theft of property from the person of another by violence," accomplished with a deadly weapon or where the victim suffers serious bodily injury. Tenn. Code Ann. §§ 39-13-401(a), -402(a) (2003).

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103 (2003). A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a) (2003).

Viewed in the light most favorable to the State, the evidence at trial established that armed with guns the appellant and Craft drove to Tigner and the victim's home under the pretense of recording a CD. As Craft discussed the matter with Tigner, the appellant pointed a shotgun at Tigner. Craft then grabbed Tigner around the neck, placed a pistol to his head, and ordered him "to drop off all [his] stuff." Inside the house, Craft held Whitehead and his girlfriend at gunpoint and demanded the location of studio equipment. The appellant, while pointing a shotgun at Tigner and the victim, ordered them to their bedroom and demanded "dope," money, and guns. While the appellant searched the bedroom, Tigner retrieved his revolver from the kitchen cabinet. He went to

-9-

Whitehead's bedroom and fired blindly at Craft, shooting him in the chest. The appellant escaped out of a bedroom window and ran to his vehicle. When he reached his vehicle, he observed Tigner in the carport. The appellant fired at Tigner several times before driving away.

During the commission of the robbery, the victim was shot in the neck. She and Craft died as a result of their gunshot wounds. Tigner testified that money, a pendant, a diamond ring, and a Tec-9 pistol were taken from his bedroom. The appellant subsequently revealed to police the locations of the Tec-9 pistol and the shotgun used in the robbery. We conclude that the evidence was sufficient to support the appellant's convictions. This issue is without merit.

### B. Prior Conviction of Armed Robbery for Impeachment Purposes

Next, the appellant contends that the trial court erred by allowing the State to introduce evidence of his prior conviction of armed bank robbery for impeachment purposes. Specifically, the appellant argues that the trial court placed "undue emphasis on the fact that the impeachment conviction involved dishonesty" and failed to consider the similarity between the prior conviction and the instant offenses. The appellant argues that the trial court failed to determine whether the probative value of the prior conviction outweighed any unfair prejudicial effect, which finding is required by Rule 609 of the Tennessee Rules of Evidence. The State maintains that the trial court committed no error. Alternatively, the State argues that even if the trial court failed to properly balance the probative value against the prejudicial effect, the error was harmless.

Rule 609(a) of the Tennessee Rules of Evidence provides:

> For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime may be admitted if the following procedures and conditions are satisfied:
>
> > (1) The witness must be asked about the conviction on cross-examination . . . .
> >
> > (2) The crime must be punishable by death or imprisonment in excess of one year under the law under which the witness was convicted or, if not so punishable, the crime must have involved dishonesty or false statement.
> >
> > (3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conviction before trial, and the court upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on

-10-

the substantive issues. The court may rule on the admissibility of such proof prior to trial but in any event shall rule prior to the testimony of the accused. If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination.

Prior to trial, the State filed a "Notice of Impeachment Conviction Pursuant to Rule 609(a)(3) [of the] Tennessee Rules of Evidence," relying on the appellant's prior convictions of armed bank robbery, theft of property, and assault. In a jury-out hearing at the close of the State's case-in-chief, the trial court denied the appellant's motion for judgment of acquittal and questioned the appellant regarding his decision to testify. The trial court then asked defense counsel if he wanted "a 609 hearing." At the hearing, the State acknowledged that it was not entitled to question the appellant regarding his prior conviction of assault, which was not an offense involving dishonesty. Defense counsel conceded that theft of property was a crime involving dishonesty, but challenged the use of the armed bank robbery conviction. Counsel argued that although the appellant had entered a guilty plea to the offense, he had not yet been sentenced. The trial court allowed the State to use the armed bank robbery conviction, finding, "[T]he law doesn't require that he be sentenced merely that he be convicted." The trial court failed to state whether it had determined that the conviction's probative value on credibility outweighed its unfair prejudicial effect on the substantive issues.

In determining whether the probative value of a prior conviction on the issue of credibility outweighs its prejudicial effect on the substantive issues, "a trial court should (a) 'assess the similarity between the crime on trial and the crime underlying the impeaching conviction' and (b) 'analyze the relevance the impeaching conviction has to the issue of credibility.'" State v. Farmer, 841 S.W.2d 837, 839 (Tenn. Crim. App. 1992) (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 609.9, at 288 (2d ed. 1990)). A trial court's ruling under Rule 609 will not be reversed on appeal absent an abuse of discretion. State v. Blanton, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996).

Tennessee court's have previously recognized that armed robbery is a crime involving dishonesty. See State v. Caruthers, 676 S.W.2d 935, 941 (Tenn. 1984); State v. Goad, 692 S.W.2d 32, 37 (Tenn. Crim. App. 1985). Thus, the appellant's prior conviction of armed bank robbery is probative of his credibility. However, the conviction is substantially similar to the offense of aggravated robbery for which the appellant was on trial and which was the offense underlying the felony murder charge. When an impeaching conviction is substantially similar to the charged offense, a danger exists that a jury could be improperly influenced by such evidence. State v. Waller, 118 S.W.3d 368, 373 (Tenn. 2003) (citing State v. Mixon, 983 S.W.2d 661, 674 (Tenn. 1999)). "However, evidence of a prior conviction that is substantially similar to the charged offense is not per se inadmissible for impeachment purposes. Under these circumstances, a trial court should carefully balance the impeaching conviction's relevance with regard to credibility against its unfair prejudicial effect on substantive issues." Id. (citations omitted).

As noted, the trial court failed to state whether it had balanced the impeaching conviction's probative value on credibility against the unfair prejudicial effect on the substantive issues. Regardless, we agree with the State that the error was harmless. Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). The appellant elected to testify despite the trial court's ruling and on direct examination acknowledged his prior conviction of armed bank robbery. Moreover, the conviction was admitted for impeachment purposes only, and the trial court instructed the jury to that effect. No details of the robbery were introduced at trial. Additionally, the evidence of the appellant's guilt was overwhelming. Three eyewitnesses testified regarding the appellant's role in the offenses, which testimony was consistent with the testimony of other State witnesses and the physical evidence. Accordingly, we conclude that the appellant is not entitled to relief on this issue.

### III.  Conclusion

Finding no reversible error, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE